IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 1:20-cr-289-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

BRANDON BOURRET,

    Defendant.

---

**DEFENDANT'S CONSOLIDATED MOTION FOR BELOW GUIDELINE SENTENCE AND RESPONSE TO GOVERNMENT'S SENTENCING STATEMENT**

---

Defendant Brandon Bourret, by and through counsel, respectfully moves this Court to impose a sentence below that recommended by the advisory United States Sentencing Guidelines. Mr. Bourret requests that he be sentenced to 20 years of imprisonment followed by five (5) years of supervised release. This substantial sentence is sufficient but not greater than necessary.

## I. INTRODUCTION

Mr. Bourret comes before the Court for sentencing as the result of his guilty plea to Count #1 of an Information charging Production of Child Pornography. Based on the circumstances of Mr. Bourret's relationship with the victims and their family, including his ongoing efforts to care for the victims and their family, and the fact that there was no sharing, distribution, or posting of the images, Mr. Bourret maintains that a downward variant sentence of 20 years imprisonment is the appropriate sentence in this case.

## II. SENTENCING UNDER 18 U.S.C. §3553(a)

The Court's sentencing decision in Mr. Bourret's case is guided and governed by 18 U.S.C. §3553(a), which directs that the Court should impose a sentence that is sufficient, but not greater than necessary. In making its determination, the Court is specifically directed to consider both the nature and circumstances of the offense and the history and characteristics of the defendant, among other factors.

The sentencing guidelines promulgated by the United States Sentencing Commission are advisory. Rather than focusing solely on the calculated guideline, courts must "consider all of the §3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). In short, the Court must "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Id.* at 52. In this specific case, a below-guideline, downward-variance sentence should be imposed.

## III. RELEVANT §3553(a) FACTORS JUSTIFYING A BELOW GUIDELINE SENTENCE

A.  **History and Characteristics of the Defendant**

   *1.  Health Issues*

A 30 year prison sentence for Mr. Bourret could very well constitute a life sentence. Mr. Bourret is 47 years old and has a number of medical issues, including asthma, hypothyroidism, chronic obstructive pulmonary diseases, high blood pressure, high cholesterol, obesity, and major depressive disorder. Doc. #45, ¶¶ 130 and 132. Mr. Bourret takes several medications, including Effexor, to treat his major depressive order. *Id.* A common and, for Mr. Bourret,

welcome side effect of Effexor, which is a serotonin and norepinephrine reuptake inhibitor, is decreased interest in sexual intercourse and loss in sexual ability, desire and drive. https://www.mayoclinic.org/diseases-conditions/depression/in-depth/antidepressants/art-20044970. Effexor is similar to Prozac, which falls within the first tier of the Bureau of Prison's three-tiered approach to chemical castration. *See United States v. Wetmore*, 2015 WL 12856455. The first tier consists of selective serotonin reuptake inhibitors. *Id.* Mr. Bourret intends to continue to take Effexor for the rest of his life, both to treat his depression and for its chemical castration effect. By the time Mr. Bourret gets out of prison, not only will he be over 60 years old, but he will be effectively chemically castrated and at low risk to sexually reoffend.

2.   *Childhood*

Mr. Bourret did not have any idyllic childhood. Raised by a single mother, Mr. Bourret never knew his father. Ms. Bourret's mother had just turned 19 years old when Brandon was born. When Mr. Bourret was a young child, he recalls his mother repeatedly blaming him for stealing her life. Without assistance, Ms. Bourret did her best to provide for basic needs like food and utilities, however, she sometimes came up short. In her letter, Mr. Bourret's mother, Ms. Denise Bourret, describes that nutritious food for her son was scarce as well as an instance where utilities were turned off in their apartment due to non-payment. Exhibit A. Mr. Bourret reported seven out of ten adverse childhood experiences detailed in Dr. Rodrigues' Psychological Evaluation. Exhibit B. Dr. Rodrigues concluded that "Mr. Bourret's history revealed various adverse childhood events and traumatic experiences, which can limit one's coping and contribute to a series of psychological vulnerabilities and hardships." *Id.*

3

The PSR in this case seems to imply that because Mr. Bourret did not describe the challenges that he faced as a child in the 15-cr-203 PSR interview, these challenges are not true. Ms. Bourret's letter, however, supports Mr. Bourret's account of his childhood which he conveyed to probation in this case. Ms. Bourret is Mr. Bourret's closest friend and the only constant person in his life. Mr. Bourret did not and does not want to appear critical of his mother, who herself had many challenges. Additionally, when Mr. Bourret was interviewed for the 15-cr-203 PSR, he had never had the benefit of a treatment program. As part of the sentence in 15-cr-203, Mr. Bourret participated in talk therapy through RDAP. In that program, Mr. Bourret learned the importance of talking about and processing one's history in order to make changes in behavior. The facts of Mr. Bourret's childhood have not changed; Mr. Bourret has changed.

Having a baby at age 19 when she was poor, uneducated, and received no financial assistance, Mr. Bourret's mother worked at a restaurant/bar when Mr. Bourret was a young child. Up until the age of ten, Ms. Bourret's mother, and Mr. Bourret's grandmother, was able to help watch Brandon while his mother was away at work. However, after the age of ten, Mr. Bourret was essentially left to care for himself when his mother was at work. During this time, Ms. Bourret was drinking heavily, and when she was home she was frequently intoxicated or recovering from intoxication. In her letter, Ms. Bourret describes how Mr. Bourret would try to care for her and himself when they were sick, including making a pink liquid because it looked like medicine. Mr. Bourret spent much of his childhood home alone trying to figure out tasks that adults typically do for children such as preparation of meals, use of medicine, and making money.

Not only was Mr. Bourret isolated at home, but he really did not have any friends growing up. Due to financial struggles, Mr. Bourret and his mother relocated 5-6 times between the time Mr. Bourret was in kindergarten and sixth grade – meaning they moved almost every year. Frequent moving contributed to Mr. Bourret's difficulties forging relationships outside of the home. Additionally, as an overweight child with decayed teeth lacking in social skills, Mr. Bourret was bullied and ridiculed and did not develop any long-term friendships. With little encouragement or support at home and no friends, Mr. Bourret missed a lot of school. The last grade that he completed was eighth. After eighth grade, Mr. Bourret dropped out of school and began using drugs and alcohol to dull his pain and loneliness. It was not until he was later incarcerated as a teenager that Mr. Bourret obtained his GED.

3. *Lack of Relationships*

Prior to meeting his ex-wife online in 2007, Mr. Bourret had only one lasting romantic relationship. When he was in his twenties, Mr. Bourret still did not have friends or meaningful relationships, but he did attend and graduate from Colorado Technical University in 2008. He still spent the bulk of his time alone studying or with his mother, not with peers or friends.

Lacking social skills and interpersonal interactions other than with his mother, Mr. Bourret's only other relationship was his online relationship with his future wife. As his wife was a citizen and resident of the Philippines, Mr. Bourret never actually met his future wife in person until he traveled to the Philippines in December of 2008. They were married in the Philippines approximately four months later in April of 2009. With little experience interacting with and relating to people other than his mother, Mr. Bourret struggled with the intimacy and complexity of maintaining the relationship with his wife.

At this point in his life, Mr. Bourret is essentially back to where he started in that his only meaningful relationship is with his mother. Their relationship is a close one and has improved now that both Bourrets are sober. Ms. Bourret, who is 68 years old, acknowledges the need for this Court to impose significant punishment but prays that Mr. Bourret can have a chance at life again outside of prison and hopefully while she is still alive.

### 4. *Criminal History*

Understanding Mr. Bourret's background, his criminal history from the time he was 16 to 19 years old, consisting of traffic, theft, and a drug case, is not particularly surprising. In his twenties, when he was enrolled in college and engaged in studying, Mr. Bourret's criminal history consists only of two Driving Under Revocation convictions. Until his two most recent cases, Mr. Bourret's criminal history appears to have been related to immaturity and his lack of resources.

Of course, in this case and 15-cr-203, Mr. Bourret committed serious federal crimes. As indicated in the draft PSR Doc. #45, p. 4, ¶ 12, n. 1, the evidence in this case was obtained from the executed search warrant in 15-cr-203. By the end of 2014, the FBI had already obtained evidence that Mr. Bourret had committed this offense. *Id.* However, the government decided to pursue the 15-cr-203 Conspiracy to Commit Computer Fraud separately and prior to completing the investigation in the instant case. Had the government made a different decision about developing, timing, and charging these two cases, the scoring of Mr. Bourret's criminal history in this case would have been different. In this case, probation indicates that the criminal convictions result in a subtotal criminal history score of six, establishing a criminal history category of III. Doc. 45, p. 25, ¶¶ 114-115. In 15-cr-203, even though that offense was

committed **after** the offending behavior in this case, the sentencing court found Mr. Bourret's criminal history category to be II. Because 15-cr-203 is not a prior offense in time, Mr. Bourret submits that his criminal history has been overrepresented in this case.

In addition to his criminal history category being affected by a case that occurred after the instant offense, because of decisions made by the government, Mr. Bourret was not afforded the opportunity to negotiate a global deal even though the government had information that Mr. Bourret had engaged in sexual exploitation at the time that they negotiated 15-cr-203. Mr. Bourret completed his 29-month prison sentence and was on supervised release in 15-cr-203 at the time that the government indicted him for the crimes he committed in this case, which was between 2011-2014 and preceded the criminal conduct in 15-cr-203. Mr. Bourret requests that the Court consider that when he was indicted in this case on September 3, 2020, he had been under the court's jurisdiction in 15-cr-203 since May 8, 2015, served a 29-month prison sentence, and was serving his supervised release.

### 5.   *Detention Conditions*

Mr. Bourret has been incarcerated in this case since September 11, 2020. The timing of his incarceration coincided with the COVID-19 pandemic. Being incarcerated during COVID has been significantly more difficult for inmates, including Mr. Bourret. In addition, Mr. Bourret has been in nine different jails during the pendency of this case. Moving and adjusting, particularly as a sexual offender, has been not only challenging but dangerous. When not segregated from other inmates, Mr. Bourret has been threatened and assaulted multiple times. When he was housed in a separate pod and relatively safe at GEO, jail staff noted that Mr. Bourret followed the facility rules and was polite to staff. (Doc. #45, ¶ 6). In fashioning his

sentence, Mr. Bourret asks that the Court take into consideration the particularly negative conditions of his incarceration over the past three years.

**B.    Nature and Circumstances of Offense**

The facts in this case differ from the majority of other production cases in this district in that there was no distribution, sharing or posting of the child pornography that Mr. Bourret produced. Therefore, the victims in this case do not suffer the same way as victims whose images live in perpetuity on the internet. While Mr. Bourret took advantage of the victims' economic circumstances for his own selfish purposes, unlike other victims, their images were never shared and there is no evidence that these images are available publicly. At the change of plea hearing, Mr. Bourret confirmed under oath that he never distributed the images of Victims #1 and #2 that he produced.

Another unique factor in this case is the relationship between Mr. Bourret and the now adult victims and their family, who have maintained a close relationship before, during, and after the offense behavior. When interviewed in 2017 by law enforcement in connection with this case, Victim #1, who was then 19 years old, indicated that she considered Mr. Bourret a friend and intended to marry him. Doc. # 45, ¶ 60. During that same interview, Victim #1 described Mr. Bourret as a good person who cared for and helped her and her family. *Id.* As evidenced by recorded jail calls between Mr. Bourret and his mother, Mr. Bourret and Ms. Bourret continue to care about Victim #1 and her family's well-being.

Mr. Bourret continued to provide financial support to the victims after they became adults and not in exchange for photographs. The offense behavior in this case ended in 2014, but even after the pornographic pictures ceased, Mr. Bourret continued to ensure that the victims and their

family received financial support. Paragraphs 71 and 72 of the first draft PSR (Doc. 45) detail Western Union and MoneyGram payments made to Victim #1 totaling $32,593.03. Counsel for Mr. Bourret has obtained additional records directly from Western Union, World Remit, and Remitly showing that from 2019 to the present, Mr. Bourret and his mother continued to provide financial support and assistance to the victims and their family. Records obtained from Western Union, World Remit, and Remitly show that the victims and their family received approximately another $14,223.94. Exhibit C. While the defense has not been able to obtain the Xoom records directly from Xoom, some receipts have been located which show another approximately $3,605.23 being sent to Victim #1. (Exhibit D - Xoom). All together, there is documentation that the victims and their family have received over $50,000. Research suggests that the current average yearly salary in the Philippines is $7,000. https://www.averagesalarysurvey.com/philippines. According to the FBI-302, when Victim #1 was interviewed by law enforcement in 2019, she indicated that she still contacts Mr. Bourret through Facebook and that Mr. Bourret continues to send her money. Victim #1 indicated that she used some money for schooling and set aside money to help her family.

Mr. Bourret was not only close with Victim #1, but he was close to her entire family. When Victim #1 was interviewed in 2017, she indicated that Mr. Bourret always sent things to Victim #1's mother's house when Victim #1 was living elsewhere. According to the same FBI-302, Victim #1 explained that when a typhoon hit the Philippines in 2013, Mr. Bourret helped Victim #1's family rebuild their home. Victim #1 described that Mr. Bourret was like family. Victim #1's parents and her family were not only aware of Victim #1 and Mr. Bourret's desire to get married but supported it. *See* Exhibit E – Translated Letters from Parents Submitted in

Petition for Alien Fiance and Accompanying Certificate of Translation. In 2018, before he was indicted in this case, Mr. Bourret lawfully pursued an alien fiance visa for Victim #1, which was denied. (*See* Exhibit F - INS Decision Letter).

Additionally, while our government and culture do not agree, the age of consent in the Philippines at the time of Mr. Bourret's relationship with Victim #1 was 12 years old. https://indianexpress.com/article/explained/raising-the-age-of-consent-in-the-philippines-7807145. It was not until 2022 that the age of consent in the Philippines changed to 16 years old. *Id.* At the time that Mr. Bourret was engaging in sexual acts with Victim #1, it was not against the law in the Philippines for Mr. Bourret to have a sexual relationship with Victim #1. The evidence in this case does not suggest that Mr. Bourret was abusive or violent with Victim #1. To the contrary, as seen in many of their communications, Mr. Bourret repeatedly expressed affection, admiration, and love for Victim #1. Undersigned counsel emailed Victim #1 in January of 2023 to obtain her feelings about Mr. Bourret and the sentence. Victim #1 responded that Mr. Bourret was a good, caring, and helpful partner. *See* Exhibit G – Email from Victim #1.

Still, as an American citizen who was in a position of power over Victims #1 and #2, Mr. Bourret should not have engaged in any of this behavior. Mr. Bourret wrongly justified his actions by a mindset that since he was living in the Philippines, his conduct was acceptable. He recognizes that this was distorted thinking and that he victimized Victim #1 and #2. While the payments and assistance to Victim #1 and her family by no means make up for the harm that he has caused, these voluntary and ongoing payments years after the sexual exploitation suggest that Mr. Bourret does truly care about the victims and their family.

### C. The Need to Avoid Unwarranted Sentence Disparities

A comparison of the public filings and recent sentences for transportation and production of child pornography offenses in this district demonstrates that Mr. Bourret's conduct, while undeniably serious, does not warrant a 30-year sentence. Most of the production cases in this district unfortunately not only involve the defendant's hands-on sexual assault of the victims but the subsequent distribution of the pornographic images which ultimately end up being available for mass viewing on the internet, resulting in ongoing victimization. In this case, there is no evidence that Mr. Bourret ever distributed or posted the videos and photographs of the victims. Pursuant to 18 U.S.C. § 3553(a)(6), this Court shall consider the need to avoid unwarranted sentence disparities. A comparison of Mr. Bourret's conduct to that of other defendants sentenced in this district suggests that the 30-year sentence recommended by probation would result in an unwarranted sentencing disparity:

- *United States v. Bailey, 20-cr-207-RBJ*

    While Mr. Bailey engaged in hands-on sexual offending against a teenage girl and recorded those sexual encounters, Mr. Bailey was permitted to plead guilty to Transportation of a Minor to Engage in Illegal Sexual Activity instead of Production of Child Pornography. Thirty-eight-year-old Mr. Bailey met the 15-year-old Minor #1 while playing an online video game. The ages of Mr. Bailey and his victim were similar to the ages of Mr. Bourret and the victims in this case at the time that he produced the child pornography. As Mr. Baily's online relationship with the victim became sexual in nature, he suggested that the victim leave home and come live with him. Mr. Bailey picked up the victim from her home in Kentucky and drove her back to Colorado to live with him.

While living together, Mr. Bailey engaged in sexual intercourse with the minor victim multiple times and made at least two recordings of the sexual intercourse, including a video that depicts Minor #1 tied up in ropes during intercourse. Despite his sexual relationship with the teenager and production of child pornography, on May 11, 2021, Mr. Bailey received a sentence of 11 years.

- *United States of America v. Stegink, 18-cr-146-RM*

   Unlike Mr. Bourret whose production was done with the victims' knowledge and consent, Mr. Stegink used a hidden camera to produce multiple videos of a 14 year-old girl changing clothes and then posted these images on the internet. Unlike Mr. Bourret who never posted or distributed the images, Mr. Stegink posted three still images of the minor victim's naked genital area on Pornhub and admitted to having sent the child pornography videos to 10 other Kik users. Based on chat content, Mr. Stegink appears to have sent four images to another individual believed to be images of Minor Victim #1 and Minor Victim #2, age 7, that were sexual in nature. Mr. Stegink admitted to two instances of touching the minor victims. Mr. Stegink also possessed at least 150 images of child pornography. On January 13, 2019, Mr. Stegink was sentenced to 11 years in prison.

- *United States of America v. McCraw, 17-cr-407-CMA*

   Like Mr. Bourret, Mr. McCraw plead guilty to Production of Child Pornography. Mr. McCraw was having and recording sex with three teenage victims. Two of the three victims in the case were between 12 and 15 years old at the time that Mr. McCraw had sex

12

with them and produced videos of such. According to the government's sentencing statement, Mr. McCraw

> [D]egraded them (the victims), treating them in dehumanizing ways solely for his deviant sexual gratification. He filmed the children and took pictures as he sexually molested them, to preserve it for his sexual gratification. He boasted of his prowess and his power over the victims. He coerced and enticed them to lead a secret life, to lie to their parents to protect himself from the law. Further, he induced the underage boys to take sexually explicit photographs of themselves and send the photos to him. He used those pictures to try to pimp the boys to other children and adult men.

Doc. 47, pp 4-5.

Mr. McCraw acted as the "trainer" or "daddy" of fetish "puppy training" where the victims were, among other dehumanizing acts, put in cages and directed to wear leashes and "butt plugs" with tails. On May 30, 2020, Mr. McCraw was sentenced to 18 years in prison.

- *United States of America v. Perez, 17-cr-230-MSK*

Mr. Perez engaged in sexual assaults of the minor victim under his care at the time that he produced child pornography. The plea agreement indicates:

> The defendant sexually abused a 7-year-old child while the child was in his care. Not only did the defendant sexually abuse the child—he took pictures of it, memorializing the abuse for time immemorial. The defendant streamed his sexual abuse of Minor #1 live across the Internet. Screen shots of that video have been circulated on the Internet.

According to the plea agreement, on multiple occasions Mr. Perez directed the child to hold signs while the sexual abuse and recording was occurring, including an instance where the defendant's penis was in the child's mouth. On November 8, 2018, Mr. Perez was sentenced to 20 years in prison.

A 30-year prison sentence for Mr. Bourret's conduct is disproportionate to the sentences imposed in these other recent cases in this district.

## IV. SUPERVISED RELEASE

Mr. Bourret is currently 47 years old. The events in this case happened when he was in his mid to late thirties. Whatever sentence the court imposes in this case, Mr. Bourret will be over 60 years old at the time he is placed on supervised release. Numerous studies have shown that offenders released at an older age are less likely to recommit sexual offenses and that sexual recidivism decreases as a linear function of age-at-release. Barbaree H.E., Blanchard R, Langton C.M. The Development of Sexual Aggression Through the Life Span: The Effect of Age on Sexual Arousal and Recidivism Among Sex Offenders. Ann N Y Acad Sci. 2003 Jun. In addition to the medication that Mr. Bourret is taking, he may be effectively castrated at the time of his release. As such, due to his age and circumstances, there is less need to impose a lengthy period of supervised release. Under the circumstances, five (5) years is a sufficient but not greater than necessary period of time for supervised release.

## V. REQUEST FOR RECOMMENDATION TO DESIGNATION

Mr. Bourret is requesting that the Court recommend designation to FCI Standstone or any other appropriate facility in the State of Minnesota. With the understanding that it is unlikely that Mr. Bourret will commence sexual offender treatment until the end of his prison term, the government does not oppose this request. The basis for this request is the proximity of FCI Sandstone and the State of Minnesota to Mr. Bourret's mother's residence in northern Iowa. As indicated, Ms. Bourret is a tremendous support to Mr. Bourret and his only meaningful relationship. Due to Ms. Bourret's numerous health conditions, including COPD, Type II

Diabetes, Anxiety, and neuropathy nerve damage in both feet, Ms. Bourret is unable to travel long distances to see Mr. Bourret. It would be beneficial to Mr. Bourret's rehabilitation for him to be able to have frequent visits with his mother.

## VI. CONCLUSION

Mr. Bourret acknowledges that he committed a very serious offense that will have a lasting and significant negative impact on people whom he cares about. He should and will be significantly punished. Based on the information presented in this motion, Mr. Bourret contends that a sentence of 20 years imprisonment is sufficient but not greater than necessary under these unique circumstances.

Dated: August 4, 2023

Respectfully submitted,

*s/ Dru Nielsen*
Dru Nielsen, No. 28775
Haddon, Morgan and Foreman, P.C.
950 17th Street, Suite 1000
Denver, CO 80202
Phone: 303.831.7364
Fax: 303.832.2628
Email: dnielsen@hmflaw.com

*Attorney for Defendant Brandon Bourret*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2023, I electronically filed the foregoing *Defendant's Consolidated Motion for Below Guideline Sentence and Response to Government's Sentencing Statement* with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Courtney McDonald*